# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

LAWRENCE B. LEVY, M.D., )
)
)
Plaintiff, ) No. 03 C 5141
) Magistrate Judge Schenkier
vs. )
)
MINNESOTA LIFE INSURANCE )
CO. (F/K/A MINNESOTA MUTUAL )
LIFE INSURANCE CO.), )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER[1]

This lawsuit involves an insurance dispute between plaintiff, Dr. Lawrence B. Levy, and defendant, Minnesota Life Insurance Company ("MLI"). The parties agree that Dr. Levy suffers from severe right knee osteoarthritis which prevents him from performing the duties of his regular occupation, and that Dr. Levy therefore qualifies for disability coverage under two policies issued by MLI (the "Policies").[2] However, the parties are at odds about what provision of the Policies provides coverage, a question that affects the duration of coverage due to Dr. Levy. Dr. Levy claims that his condition qualifies for coverage as an "injury," in which case he would be contractually entitled to lifetime disability benefits. For its part, MLI claims that the condition qualifies for

---

[1] By the parties' consent, on November 13, 2003, this case was transferred to Magistrate Judge Ian H. Levin for all purposes, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c) (doc. ## 9, 10). On December 2, 2005, by order of the Executive Committee, the case was reassigned to this Court for all further proceedings (doc. # 21).

[2] The parties settled an earlier coverage dispute and paid disability benefits to Dr. Levy commencing July 31, 1997 through June 11, 2003 (the Policies' first anniversary date after Mr. Levy's 65th birthday) (MLI's Local Rule 56.1 Statement of Material Facts ("MLI's 56.1 Stmt.") ¶¶ 59-60).

coverage as a "sickness, in which case benefits properly terminated as of the first anniversary date of the Policies after Dr. Levy reached the age of 65 years old (that is, June 11, 2003).

Plaintiff (doc. # 30) and defendant (doc. # 35) each have moved for summary judgment based on their respective – and conflicting – views of the proper basis for coverage under the Policies. After careful review of the record, the Court concludes that Dr. Levy's disability falls within the "sickness" coverage of the Policies at issue, and that Dr. Levy's disability benefits have properly been terminated. Accordingly, we grant MLI's motion for summary judgment, and deny Dr. Levy's motion for summary judgment.

## I.

We begin the discussion with the legal standards that govern summary judgment motions, which are well-established. Summary judgment is proper if the record shows that there is no genuine issue as to any material fact, and that the moving parties are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Where the issues to be decided are purely legal, and the parties have filed cross-motions for summary judgment on that issue, the Court must resolve the legal issue and enter judgment "as a matter of law" for one side or the other. Where resolution of the legal issue ends the case, a final judgment is entered on cross motions under Rule 56(c) for the prevailing party. With regard to factual issues, a genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249-50. In deciding a motion for summary judgment, the Court must view all evidence in the light most favorable to the nonmoving party, and must draw all reasonable inferences in the nonmovant's favor. *Santiago v. Lane,* 894 F.2d 218, 221 (7th Cir. 1990).

When a material fact or a set of facts yields competing, but reasonable, inferences, then there is a genuine issue that precludes summary judgment. The non-moving party's burden is to identify facts that are both material and genuinely disputed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). To be material, a fact must be able to affect the outcome under the substantive law governing the motion. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 595-99 (7th Cir. 2000). A "genuine issue" exists if a reasonable trier of fact could find in favor of the non-moving party. *Id.* at 599. To establish a genuine issue, the party opposing the motion for summary judgment must serve and file, pursuant to Local Rule 56.1, a concise statement outlining the material facts that require denial of summary judgment, supported by citations to the evidentiary materials that support those denials (*e.g.*, affidavits, depositions, answers to interrogatories, admissions etc.). Fed. R. Civ. P. 56(c). Although the party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact, *Celotex*, 477 U.S. at 323, the non-moving party cannot rely upon the pleadings alone, but must use the evidentiary tools outlined above to identify the material facts that show there is a genuine issue for trial. *Id.* at 324; *Insolia*, 216 F.3d at 598.

## II.

The Court finds the following facts, taken from the parties' Rule 56.1 Statements of Undisputed Facts,[3] to be material and without genuine dispute.

Dr. Levy was born on June 11, 1937, and turned 65 years old on June 11, 2002 (MLI's 56.1 Stmt. ¶ 59). During all relevant times, he has been insured under two disability insurance policies

---

[3]The plaintiff's Rule 56.1 Statement of Undisputed Facts will hereinafter be referred to as "Levy's 56.1 Stmt. ¶ ___". The defendant's Rule 56.1 Statement of Undisputed Facts will be referred to as "MLI's 56.1 Stmt. ¶ ___".

issued by Minnesota Life: Policy No. 1439211H (issued in 1980), and Policy No. 1521179H (issued in 1982) (MLI's 56.1 Stmt. ¶ 2). The Policies define "disability" and "disabled" as follows:

> Whenever we use the word "disability" or "disabled" in this policy we mean that, due to sickness or injury you are unable to perform the substantial and material duties of your regular occupation.

(*Id.* ¶ 3). The Policies further define "injury" and "sickness," respectively, as follows:

**injury**

An accidental bodily injury you sustained while this policy is in force.

**sickness**

A disease or illness which is diagnosed or treated while this policy is in force.

(*Id.* ¶ 4). The Policies provide a maximum benefit period to age 65 if the insured is disabled due to "sickness." The Policies provide potential lifetime benefits if the insured is unable to perform the duties of his regular occupation due to "injury."

From the time the Policies were issued until June 1994, plaintiff worked as a physician with a private medical group (MLI's 56.1 Stmt. ¶ 6). Beginning in September 1995, plaintiff worked as a physician for Dwight Correctional Center on an independent contractor basis (*Id.* ¶ 7). In that job, Dr. Levy provided primary and urgent care for inmates and he worked full time (a forty-hour, five-day week) from September 1995 until February 29, 1996, when his contract was cancelled (*Id.*). Dr. Levy did not resume working after February 1996 (*Id.*).

The parties agree that plaintiff was disabled as of March 1, 1996 (Levy's 56.1 Stmt. ¶ 21). On April 16, 1996, plaintiff submitted a claim to MLI alleging disability due to right knee pain (MLI's 56.1 Stmt. ¶¶ 8, 10, 44). With this claim, plaintiff included a letter, dated April 16, 1996, which states in part:

4

> During the summer of 1987 or 1988, while playing basketball, I fell and landed on my right knee. At the time I didn't think too much of it and resumed playing even though I was experiencing some pain. Later that day my right knee swelled up and became more painful. For approximately the next 2-3 weeks the pain and limitation of my motion of my knee persisted. Several months later the pain returned with no apparent precipitating event. Initially I could control the pain by using non-steroidal anti-inflammatory medication periodically.

(*Id.* ¶ 11). MLI requested documentation regarding Dr. Levy's claim. Dr. Levy sought to substantiate his claim by initiating an examination with Dr. Chadwick Prodromos, an orthopedic surgeon, on April 20, 1996 (*Id.* ¶ 33). Because the April 20, 1996 examination notes refer to previous medical treatment, we first discuss evidence concerning Dr. Levy's knee condition prior to April 1996.

### A.

On February 3, 1989, plaintiff sought medical treatment from Dr. Bruce Hallmann, an orthopedic surgeon, for pain in his right knee (MLI's 56.1 Stmt. ¶ 17). Based on his February 3 examination, Dr. Hallmann determined that arthroscopic surgery to plaintiff's right knee on an outpatient basis was warranted. This surgery was performed on February 14, 1989, and it included a partial medial meniscectomy, cartilage shaving, and resection (*Id.* ¶ 18).

In a Report of Operation, Dr. Hallmann set forth both preoperative and postoperative diagnoses. The preoperative diagnosis was: "internal derangement-right knee" (MLI's 56.1 Stmt. ¶ 19). The post-operative diagnosis was: "[c]omplex degenerative tear of posterior horn of medial meniscus, [and] advanced chrondromalacia . . . ." (*Id.*). Dr. Hallmann also reported that Dr. Levy "had a long history of problems with his right knee," and "has had progressive difficulties with pain and clicking at the right knee" (*Id.* ¶ 21). Dr. Hallmann further noted that Dr. Levy had "apparently injured the right knee many years" prior to the surgery, "but underwent no specific therapeutic

5

intervention" (*Id.*). In his deposition, Dr. Hallmann explained that the reference in his report to a "long history" of right knee problems did not mean "a problem two years before [the 1989 surgery]" because he "would have probably indicated that" in his notes (*Id.* ¶ 22). Rather, he said: "[w]hen I say a long history of many years, I don't usually mean just a year or two. It's usually longer than that" (*Id.*).

In his deposition, Dr. Hallmann opined that "[i]ndividuals can develop degenerative meniscal cartilage tears in association with osteoarthritis" (MLI's 56.1 Stmt. ¶ 20). Dr. Hallmann also testified that plaintiff's degenerative tear at the time of the February 14, 1989 surgery was not "fresh" (*Id.* ¶ 23).

> ... [I]t was not a clean or clear cartilage tear. The cleavage planes were not well defined. They had already become degenerated. They had become frayed, fibrillated, [of] irregular character and contour. So this was not a recent tear of the medial meniscus. [A]nd, in fact, degenerative changes had already taken place at the tear site.

(*Id.*). Dr. Hallmann further stated in his deposition that he was unable to determine, based on his medical records, whether the degenerative meniscus tear noted in the Report of Operation was the result of a specific trauma or a degenerative process such as osteoarthritis (*Id.* ¶ 24).

Within about three weeks, after the arthroscopic surgery, Dr. Levy returned to work as a physician at Flashner Medical Group (MLI's 56.1 Stmt. ¶ 25). Dr. Levy continued to work in that position – and then at Dwight Correctional Center – for approximately seven years (May 1989 through February 1996) (*Id.* ¶ 7). During that seven year period, Dr. Levy did not seek out any medical diagnosis or treatment for his knee.[4] On July 20, 1992 and May 3, 1993, Dr. Levy signed

---

[4]The parties dispute whether plaintiff *continuously* self-treated pain in his right knee between the medical treatment by Dr. Hallmann in 1989, and the medical treatment by Dr. Prodromos in 1996 (MLI's Resp. to Pl.'s 56.1 Stmt. ¶ 13). We do not consider self-medication by taking Ibuprofen to be the same as seeking out medical diagnosis or

Notices of Policy Lapse and Reinstatement Offer with respect to one of the Policies (No. 1439211H) in which he certified that he "ha[d] not suffered a disability, been injured or sick" since the end of that Policy's premium payment grace period[s] in 1992 and 1993 (*Id.* ¶ 28; Ex. B (Levy Dep.) Exs. 5-6). On July 9 and 11, 1994, plaintiff signed Notices of Policy Lapse and Reinstatement Offer with respect to another Policy (No. 1521179H), in which he certified that he "has not suffered a disability, been injured or sick" since the end of the Policy's premium payment grace period[s] in 1993 and 1994" (*Id.* ¶ 29: Ex. B (Levy Dep.), Exs. 7-8). Furthermore, in a 1994 application for life insurance coverage with MLI, Dr. Levy certified that there was "Full Recovery" from his arthroscopic surgery, and he had experienced "no problems since" (*Id.* ¶¶ 30-31).

**B.**

In April 1996, plaintiff was examined by Dr. Prodromos. After that examination, Dr. Prodromos stated in his medical chart: "Assessment: Right knee DJD versus medial meniscal injury" (MLI's 56.1 Stmt. ¶ 33).[5] Dr. Prodromos sent Dr. Levy to a radiologist, Dr. Paul Backas, for an MRI, which was given to Dr. Levy on April 22, 1996. Dr. Backas reported that the MRI showed thinning, altered signal intensity and medial subluxation of body medial meniscus consistent with degenerative change with no macromeniscal tear identified. (*Id.* ¶ 37).[6]

On April 27, 1996, Dr. Prodromos stated in a medical chart note that the Backas report "would appear to be consistent with DJD and not internal derangement" (*i.e.,* a meniscal injury) (*Id.*

---

treatment. Thus, for purposes of the resolution of the motions before us, we find this dispute to be immaterial to the outcome.

[5]"DJD" is an abbreviation for degenerative joint disease which Dr. Prodromos described as disease of the articular cartilage as well as the subchondral bone (MLI's 56.1 Stmt. ¶ 40).

[6]Based on his review of the Backas report, Dr. Prodromos stated that the correct term was micromeniscal tear, not macromeniscal tear (MLI's 56.1 Stmt. ¶ 38).

7

¶ 39). In the same note, Dr. Prodromos stated that based on his review of the Report of Operation by Dr. Hallmann, "both the diagnosis and the procedure at that time certainly were consistent with his [Levy's] current advanced degenerative joint disease" (*Id.* ¶ 41).

On May 11, 1996, Dr. Prodromos signed an Attending Physician Statement ("APS") identifying plaintiff's diagnosis as right knee osteoarthritis (MLI's 56.1 Stmt. ¶ 43). The APS was used as the proof of loss that plaintiff submitted to MLI regarding his disability (*Id.* ¶¶ 9-10). Dr. Prodromos stated that Dr. Levy should be limited to sedentary work, with only occasional standing and walking (*Id.* ¶ 44). From 1996 through 2002, Dr. Prodromos examined Dr. Levy on four additional occasions: September 26, 1997; January 13, 1998; November 28, 1998; and March 25, 2002. During that period, Dr. Prodromos completed six supplemental APS forms, each time repeating his diagnosis of osteoarthritis/degenerative joint disease (*Id.* ¶ 48).

When deposed in this case, Dr. Prodromos testified that "DJD basically means disease of the articular cartilage as well as the subchondral bone" (MLI's 56.1 Stmt. ¶ 40). With respect to the origin or cause of the DJD, Dr. Prodromos stated:

> It is my opinion to a reasonable degree of orthopaedic surgical certainty that his [Levy's] severe right knee pain was – is directly attributable to the meniscal tear, indirectly. When I saw him he wasn't hurting because of a meniscal tear. It was occurring because the meniscal tear had caused the sequence of events of articular cartilage damage and arthrosis and pain in his knee.

(*Id.* ¶ 45). Dr. Prodromos also stated that "[a]ll meniscal tears are caused by trauma, even so-called degenerative tears" (*Id.* ¶ 47).

On December 6, 2005, David Waldram, M.D., an orthopedic surgeon consulted by MLI, concurred with the diagnosis of osteoarthritis/degenerative joint disease, based on his review of the plaintiff's medical records and the deposition testimony of Drs. Hallmann and Prodromos (MLI's

8

56.1 Stmt. ¶ 54). However, Dr. Waldram further opined that Dr. Levy's arthritis is not, in all medical probability, related to the injury of 1987 (*Id.* ¶ 55). According to Dr. Waldram, the 1989 Report of Operation contains findings consistent with degenerative arthritis and a degenerative meniscal tear; the report further states that these degenerative changes predated plaintiff's alleged 1987 basketball injury. Dr. Waldram concludes that plaintiff's right knee osteoarthritis/degenerative joint disease began prior to 1987 and was not caused by the 1987 basketball incident (*Id.* ¶ 56).

Dr. Waldram also pointed to other medical evidence in the record that plaintiff's arthritis was not caused by the 1987 basketball incident. For example, Dr. Waldram stated that osteoarthritis typically presents unilaterally and asymmetrically; thus, the fact that plaintiff's arthritis appears in his right knee does not support that the arthritis was caused by an injury to the right knee (MLI's 56.1 Stmt. ¶ 57). Dr. Waldram also commented that Dr. Levy has symptoms of osteoarthritis in other areas of his body not involved in the 1987 incident: in his spine, left knee and right hip (*Id.* ¶ 58). Dr. Waldram indicated that plaintiff's right hip arthritis could not be related to overcompensation on account of the right knee arthritis because overcompensation would occur on the opposite side or left hip (*Id.*).

MLI initially declined Dr. Levy's disability claim on the basis that the Policies had lapsed due to non-payment of premiums (MLI's 56.1 Stmt. ¶ 59). In 1996, plaintiff filed a civil suit in the Circuit Court of Cook County, Illinois, which was removed to this Court on July 24, 2003 (*see, e.g., Levy v. Minnesota Mutual Life Ins. Co.*, No. 96 C 8472). Dr. Levy subsequently filed a motion for summary judgment, claiming entitlement to monthly disability benefits pursuant to the Policies. On August 5, 1997, before the resolution of the summary judgment motions, the parties settled the coverage dispute and, pursuant to the settlement agreement, MLI paid disability benefits to plaintiff

from July 31, 1997 through June 11, 2003, which is the Policies' first anniversary date after plaintiff's 65th birthday (*Id.* ¶ 59). The parties did not settle (and specifically reserved their right to adjudicate) the issue presently before the Court: whether plaintiff's disability falls within the Policies' "sickness" or "injury" coverage, or instead under the "injury" coverage (*Id.* ¶ 60).

### III.

In their cross motions for summary judgment, the parties agree that Dr. Levy suffers a disability from the condition of degenerative arthritis in his right knee. Thus, the parties frame the resolution of the case as turning on one legal question: whether that condition is a "sickness" or, instead, an "injury" as those words are defined under the Policies.

Dr. Levy argues that his condition is an "injury" within the meaning of the Policies, on the ground that his degenerative arthritis was proximately caused by an "injury" he suffered (the 1987 basketball incident) while the Policies were in effect. Dr. Levy asserts that the "fact that his arthritis can be characterized as a 'sickness' is irrelevant to the question of whether his knee injury is why he now is unable to walk." On the other hand, MLI argues that the Policies contain no proximate cause standard. MLI contends that Dr. Levy's disability is a "sickness" within the meaning of the Policies because that disability results from a condition (degenerative arthritis) that is a disease or illness; the cause of that condition is irrelevant.

There is no dispute that Illinois law governs this question. Under Illinois law, "[a]n insurance policy is a contract, and the general rules governing interpretation of other types of contracts also govern the interpretation of insurance policies." *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005). Whether terms of an insurance policy are ambiguous "turns on whether the policy language is subject to more than one reasonable interpretation." *Id.*

"If the policy language is unambiguous, the policy will be applied as written unless it contravenes public policy." *Id.* On the other hand, "[i]f the policy language is subject to more than one reasonable interpretation, it is considered ambiguous and will be construed against the insurer." *Gillen v. State Farm Mut. Automobile Ins. Co.*, 830 N.E.2d 575, 582 (Ill. 2005).

When interpreting a contract, we give policy terms their ordinary and popular meaning. *Outboard Marine Corp. v. Liberty Mut. Ins.*, 607 N.E.2d 1204, 1212 (Ill. 1992). A court cannot view particular policy terms in isolation. Rather, a court must read an insurance policy as a whole, and strive for an interpretation that accounts for all policy language and gives effect to all policy terms. *General Cas. Co. of Illinois v. Carroll Tiling Service*, 796 N.E.2d 702, 707-08 (Ill. App. 2003). "A strained, forced, unnatural, or unreasonable construction, or one which would lead to an absurd result, must not be adopted." *U.S. Fire Ins. Co. v. Hartford Ins. Co.*, 726 N.E.2d 126, 128 (Ill. App. 2000). Our "primary objective when construing an insurance policy is to ascertain and give effect to the intention of the parties, as expressed in the policy language." *Gillen*, 830 N.E.2d 582.

Based on the Court's reading of the Policies and after consideration of the parties' arguments and the undisputed facts, we agree that MLI is entitled to summary judgment in its favor.

### A.

When interpreting the Policies, we begin with their language and structure. The Policies define the words "disability" and "disabled" to mean "that due to sickness or injury you are unable to perform the substantial and material duties of your regular occupation." The Policies in turn define "sickness" as a "disease or illness which is diagnosed or treated while this policy is in force," and "injury" as an "accidental bodily injury you sustained while this policy is in force."

11

While the Policies define the key terms "disability," "sickness," and "injury," they do not define the phrase "due to." That phrase plainly sets forth a causation standard: a disability must be caused by (that is, "due to") a qualifying sickness or injury in order for coverage to apply. However, we must decide what level of causation the Policies require. Arguably, there are a variety of possibilities.

One is the "proximate causation" standard urged by Dr. Levy, which Illinois law defines as "[any] cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury." Illinois Pattern Jury Instruction (IPI) Civil, No. 15.01 (2006 ed.). Another is "but for causation," which is far broader than proximate cause, and is defined as "[t]he cause without which the event could not have occurred." Black's Law Dictionary at 212 (7th ed. 1999). Yet another is "immediate cause," which is narrower than proximate cause, and is defined as "[t]he last event in a chain of events, though not necessarily the proximate cause of what follows." *Id.* And, still another is "sole cause," which is defined as the "only cause that, from a legal viewpoint, produces an event or injury." *Id.* at 213.

In our view, "immediate cause" best fits the ordinary and popular meaning we believe would be given to the phrase "due to." The ordinary and popular meaning refers to the meaning that lay persons – not lawyers – would give to a term. *See Faulkner v. Allstate Life Ins. Co.*, 684 N.E.2d 155, 157-58 (Ill. App. 1997) (instructing that insurance policy interpretation should consider "the purpose of the ordinary man when making an ordinary contract"). When people consider what caused an event, we believe the most common and natural approach is to focus on the immediate reason (for example, "the road was slick due to the ice"). We do not believe the common approach is to look

to the "but for reason" for an event (for example, "the road was slick due to the ice, which formed because the temperature was below freezing, which did not melt because the road is not heated, etc."). Moreover, proximate cause is a legal concept, and thus applying that standard would fail to give the phrase "due to" an ordinary and popular meaning.

Consideration of the Policies as a whole further confirms that "immediate cause" is the standard of causation imposed by the phrase "due to." Under the Policies, the causation requirement embodied in the phrase "due to" serves two separate functions. *First*, causation determines whether any coverage under the Policies has been triggered: that is, whether there is a disability that is caused by a qualifying sickness or injury.

*Second*, and no less important, causation serves the additional function of determining which of those events – sickness or injury – in fact caused the disability. That determination is central to the application of the Policies, because it controls the length of time during which benefits will be paid. The Policies provide that if the disability is due to a sickness, benefits will cease once the insured reaches the age of 65 years old. On the other hand, if the disability is due to an injury, benefits will continue for the insured's lifetime.

The proximate causation standard fails to satisfy this latter function required by the Policies. Under the Policies, a disability cannot be "due to" both a sickness and an injury; if that were the case, there could be no determination as to the duration of benefits. Thus, under the Policies, the causation standard must permit a clear delineation of whether a disability is due to – "caused by" – an injury on the one hand, or a sickness on the other hand. The proximate cause standard is ill-suited to that task, because it contemplates that a particular act or event "need not be the only cause." For this reason, if applied to the definition of disability under the Policies, the proximate cause standard

13

would fail to provide a clear answer on the question of whether disability benefits would be paid for the insured's lifetime (because it was due to an injury) or would cease at age 65 (because it was due to a sickness).

To the contrary, use of a proximate cause standard would create needless disputes and uncertainty about the duration of benefits. For example (to adapt a hypothetical offered by MLI), consider the situation of an insured who has a "sickness" that can cause temporary seizures, but that is not itself disabling under the Policies. Let us further assume the insured experiences a seizure while driving, that the seizure leads the insured to lose control of the automobile and suffer an accident that leaves the insured unable to walk, and the inability to walk would render the insured "disabled." The natural position of the insured would be that the disability was due to an injury (the accident), and that benefits should extend for the insured's lifetime. However, under the proximate cause standard urged by Dr. Levy, the insurer could assert that the disability was due to the sickness that caused the seizure and thus the accident, and on that basis assert that the insured's benefits would cease at the age of 65.

The fact that use of a proximate cause standard could result in such a dispute is further evidence that such a standard was not intended by the Policies. *See U.S. Fire Ins. Co.*, 726 N.E.2d at 128 ("A strained, forced, unnatural, or unreasonable construction, or one which would lead to an absurd result, must not be adopted"). We believe that a standard of "immediate cause" would best serve the dual purpose of the causation requirement under the Policies. Focusing on the immediate cause of the disability will promote certainty about the duration of coverage, and thus help avoid costly and protracted disputes (such as the one in this case) that seek to unravel all of the various factors and influences that, over many years, may have contributed in some way to a disability.

14

Thus, we conclude that the causation standard for disability under the Policies, embodied in the phrase "due to," is a standard of immediate cause.

In reaching that conclusion, we have considered *Faulkner v. Allstate Life Ins. Co.*, 684 N.E.2d 155 (Ill. App. 1997), a case debated by the parties in their respective submissions. In *Faulkner*, the court considered a clause in an accidental death and dismemberment insurance policy that defined injury as follows:

> "Injury" means bodily injury caused by an accident occurring while insurance is in force and which injury results, within 365 days of the accident, *directly and independently of all other causes*, in any of the losses to which the insurance applies, to wit, death, dismemberment and the total and irrecoverable loss of sight.

*Id.* at 156 (emphasis in original). The court construed the phrase "directly and independently of all other causes" to create a proximate cause standard. *Id.* at 157. In reaching that conclusion, the court explained that the same phrase had been given that meaning when interpreting other insurance policies, and that this interpretation was consistent with "'the reasonable expectation and purpose of the ordinary man when making an ordinary contract.'" *Id.* at 157-58 (quoting *Carlson v. New York Life Ins. Co.*, 222 N.E.2d 363 (Ill. App. 1966)).

For several reasons, the *Faulkner* analysis does not support Dr. Levy's attempt to apply a proximate cause standard to the Policies. *First*, of course, is the fact that the language at issue in *Faulkner* differs from the language here. Dr. Levy has not cited to authority interpreting the phrase "due to" as creating a proximate cause standard in an insurance policy, and we are aware of none.

*Second*, the purpose of the operative causation language at issue in *Faulkner* differs substantially from the purpose of the phrase "due to" as used in the Policies. In *Faulkner,* the purpose of the causation language in issue was solely to determine whether coverage existed for losses allegedly sustained from a bodily injury caused by an accident. *Faulkner*, 684 N.E.2d at 156.

The *Faulkner* causation language played no role in determining the duration of coverage. By contrast, under the Policies at issue in this case, the phrase "due to" is critical not only to determining the existence of coverage, but also to determining the duration of coverage. The method for determining the duration of coverage under the Policies here is to determine whether the disability in question is "due to" a sickness or, instead, is "due to" an injury. Whereas a proximate cause standard was sufficient to perform the sole function required under the insurance contract in *Faulkner*, for the reasons we set forth above, it is insufficient to perform the multiple functions required for the causation standard under the Policies.

We therefore reject Dr. Levy's request that we interpret the Policies to apply a proximate cause standard to determining whether a disability is due to a sickness or, instead, to an injury. We conclude that under the Policies, "due to" requires a determination of the immediate cause of the disability. Given the multiple purposes that causation must serve under the Policies, that interpretation best comports with "the reasonable expectation and purpose of the ordinary man when making an ordinary contract." *Faulkner*, 684 N.E.2d at 157-58.

The undisputed facts show that under an immediate cause standard, Dr. Levy's disability is due to a sickness. There is no dispute that the disability he claimed in 1996 was due to degenerative arthritis in his right knee, and that this condition is a "sickness" as defined in the policy. Accordingly, on this basis, MLI's summary judgment motion must be granted, and Dr. Levy's competing summary judgment motion must be denied.

**B.**

Although not necessary to our decision today, we note that Dr. Levy's claim would be tenuous at best even under a proximate cause standard. A linchpin to Dr. Levy's proximate cause

16

argument is that the degenerative arthritis that was the basis of his 1996 disability claim had its roots in a basketball injury he allegedly suffered in 1987. There are two problems with this linchpin.

At the threshold, there is serious question about whether Dr. Levy has offered sufficient evidence to link his arthritic condition with the alleged injury in 1987. Dr. Prodromos testified that Dr. Levy's knee condition occurred "because the meniscal tear had caused the sequence of events or articular cartilage damage and arthrosis and pain in his knee" (MLI's 56.1 Stmt. ¶ 45). However, Dr. Prodromos did not opine that the cause of that meniscal tear was an injury in 1987. On the other hand, Dr. Hallman, who performed Dr. Levy's knee surgery in 1989, testified that the meniscal tear he repaired in 1989 was not "fresh" or "recent," that Dr. Levy "apparently injured his right knee many years before" the surgery, and that the tear likely occurred prior to 1987 (*Id.* ¶¶ 21-22). Similarly, Dr. Waldram has testified that Dr. Levy's "arthritis is not in all medical probability related to the injury of 1987" (*Id.* ¶ 55).

The only testimony that links Dr. Levy's meniscal tear to a 1987 injury is that of Dr. Levy himself, which is not based on any medical examination or diagnosis that occurred at the time of the alleged event. "Where the injury complained of is remote in time from the accident or the condition is one that is shrouded in controversy as to origin . . . layman testimony may be insufficient to establish a *prima facie* showing of a causal relationship." *DeWalt v. State of Illinois*, 46 Ill. Ct. Cl. 293, 293 (Ill. Ct. Cl. 1994) (quoting *Harris v. Day*, 451 N.E.2d 262, 266 (Ill. App. 1983)). Because of the grounds on which we resolve the case, we need not pursue the question of whether Dr. Levy's testimony on this point would be sufficient to link his arthritic condition to the alleged 1987 injury.

In addition, we note that the proximate cause standard reflects the recognition that, "[a]s a practical matter, legal responsibility must be limited to those causes which are so closely connected

with the result and of such significance that the law is justified in imposing liability." W.Page Keeton, *Prosser and Keeton on Torts* § 41, at 264 (5th ed. 1984). In this case, the summary judgement evidence raises a significant question about the closeness of any connection between alleged injury in 1987 and Dr. Levy's 1996 disability.

*First*, as discussed above, there is medical evidence that Dr. Levy had damage to his right knee that pre-dated the alleged 1987 injury. *Second*, in the claim he submitted to MLI, Dr. Levy stated that the pain and limited motion in his knee that occurred at the time of the 1987 event persisted only for two to three weeks, and then subsided for several months until the pain allegedly returned "with no apparent precipitating event." *Third*, after the 1989 surgery, Dr. Levy was able to work for some seven years, during which time he never sought further medical diagnosis or treatment for his knee. *Fourth*, at various times in 1992 through 1994, Dr. Levy certified that during those periods, he had not suffered a disability, been injured or sick. *Fifth*, in applying for life insurance in 1994, Dr. Levy represented that he had made a "full recovery" from the 1989 surgery, and that he had experienced "no problems since" that surgery.

Again, because of the grounds on which we decide the summary judgment motions, we need not address this point further. We only raise this point, and the question concerning the sufficiency of Dr. Levy's testimony on the question of the source of the meniscal tear, to underscore that Dr. Levy's case would be a difficult one at best one even under the proximate cause standard he seeks.

## CONCLUSION

For the reasons stated above, it is therefore ordered that plaintiff's motion for summary judgment (doc. # 30) is denied, and defendant's motion for summary judgment (doc. # 35) is granted. This case is terminated.

ENTER:

_____
SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: December 4, 2006